1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THOMAS NORTHROP,

        Petitioner,

    v.

EDDIE YLST, Warden,

        Respondent.

_____/

No. C 06-02527 MHP

**MEMORANDUM & ORDER**
**Re: Petition for Writ of Habeas**
**Corpus**

      Thomas Northrop, an inmate at the California State Prison, San Quentin, filed this action seeking a writ of habeas corpus pursuant to 28 U.S.C. section 2254.  His petition is now before the court for review pursuant to 28 U.S.C. section 2243 and Rule 4 of the Rules Governing Section 2254 Cases.  Having considered the arguments presented and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND[1]

      Northrop was convicted of second-degree murder and felony child abuse in connection with the murder of his twenty-two-month-old step-daughter, Kelley.  The murder took place in Redwood City, California on December 9, 1979.

      From October 1979 to the time of the fatal beating, Northrop was working as a photo lab technician and pursuing an Associate of Arts degree so that he could return to the Army and become a commissioned officer.  Kelley was the biological daughter of Northrop's wife, Sheila, from a prior relationship.  Sheila was the dominant caretaker and disciplinarian for Kelley, even though Northrop

UNITED STATES DISTRICT COURT
For the Northern District of California

1   knew Sheila had mental problems and had been beating Kelley.  Resp.'s Exh. 2 at 4; Pet.'s Exh. C-

2   3b at 23.  These beatings increased in the days leading up to the murder, to the point that Kelley

3   would cry so much she would begin to choke.  Pet.'s Exh. C-3b at 41.  Northrop claims he did not

4   want to believe this abuse was occurring.  Pet. Br. at 16; Pet.'s Exh. C-3b at 31.

5        On December 9, 1979, Sheila grabbed Kelley and spanked her for an unknown reason.

6   Northrop witnessed the spanking but detached himself from the scene and retired to the bedroom.

7   Kelley began vomiting, and Sheila brought her to the bathroom.  Northrop checked on Kelley, but

8   was told everything was fine.  Kelley's vomit appeared reddish, indicating she was vomiting blood,

9   but Northrop was unsure if it was blood because the family had eaten pizza for dinner.  Pet.'s Exh.

10  C-3b at 34.  Northrop then left the bathroom, returned to the bedroom, shut the bedroom door and

11  turned on the air conditioner to block out the sound of Kelley being spanked.  Pet.'s Exh. C-3b at

12  43–4.  Northrop may have heard the sounds of thumping in the bathroom, but with the television and

13  air conditioning on he was unsure of what he heard.[2]  Pet.'s Exh. C-4 at 4.  Northrop was aware that

14  Sheila was spanking and hitting Kelley while Kelley was over the toilet.  Pet. Br. at 15.  When

15  Sheila returned to the bedroom, Northrop and Sheila "made love" and eventually went to sleep.

16  Exh. C-4 at 7.  Northrop woke Sheila up at around 1 a.m. and invited her to join him in a cold

17  shower, which she declined.  Northrop eventually went back to sleep.

18        The next day, Northrop discovered Kelley was limp and non-responsive.  Northrop and

19  Sheila brought Kelley to the emergency room, where she was pronounced dead.  Resp.'s Exh. 3,

20  Parole Consideration Hearing Transcript, July 19, 2004,  at 15–16 (hereinafter "PT").  An autopsy

21  detailed the injuries:

22        Four lacerations inside her lower lip; three of which were one-eighth-inch
         long and one was one-half-inch-long; bruising to the lower chin area; the
23        lower external abdominal region had two large abrasions; the right
         forearm had three healing burn marks and finger impressions where her
24        arm had been held; the internal abdominal region had bruising which was
         attributed to blunt force and [might have been] the [] cause of death; her
25        right kidney had a one-half-inch laceration; the lungs had multiple
         pulmonary contusions so severe that there were air bubbles present on the
26        exterior portion of the lungs, and were the result of blunt force and [may
         have been] [] the cause of death; the cranium had a two-inch diameter
27        bruise and the brain itself was swollen; and four fractured ribs on her

28

2

right side and six fractured ribs on her left side that appeared to have
been fractured from an earlier incident and appeared to be refractured.

PT at 16–17 (autopsy statement slightly rephrased for clarity).

Considering the extent of the injuries, medical examiners and experts believed that these injuries were inflicted upon Kelley over an extended period of time.  See Resp.'s Exh. 11 at 1; Pet. Br. at 13.

When questioned by the police, Northrop originally feigned ignorance about the cause of Kelley's death and the bruises on her body.  In a second interview, Northrop admitted Sheila was suffering from emotional and mental problems.  He further admitted there was a "strong possibility" Sheila might have been hurting Kelley and "taking out her aggressions."  Pet. Br. at 14.  In his third police interview, Northrop again disclaimed any knowledge of Kelley's injuries.  Northrop was arrested on December 11, 1979.  He agreed to take a polygraph but manipulated his breathing patterns to trick the polygraph.  When confronted with the suggestion that he "gamed" the polygraph, Northrop claimed he did not want to answer any questions that would implicate his wife. He agreed to give another statement as long as he would not have to testify against her.  Northrop's trial began on July 1, 1980.

On February 17, 1981, Northrop was tried and convicted for second-degree murder and felony child abuse.  He was committed to prison on terms of fifteen years to life, with concurrent terms of the mid-term of two years for child endangerment.  While in prison, Northrop eventually re-married and had a biological son, Max, with his new wife.

Northrop's petition concerns the execution of his sentence rather than his conviction. Specifically, he challenges the 2004 denial of parole by the Board of Prison Terms ( "Board"); that decision took place on July 24, 2004 and became final on November 16, 2004.


PROCEDURAL HISTORY

    A.    Parole Hearings

Northrop has had seven parole consideration hearings.  His first parole consideration hearing was held on October 19, 1989.  The Board denied him parole for two years based on the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   commitment offense, his unstable social history, and an unfavorable psychological report.

2   Northrop's second parole consideration hearing was on October 17, 1991.  The Board relied on the

3   same factors in denying parole.  Northrop's third parole consideration hearing was on December 28,

4   1993; the Board relied on the same factors in denying Northrop parole.  The Board denied Northrop

5   parole for two years.  Northrop's fourth parole consideration hearing was on May 7, 1996.  The

6   Board denied Northrop parole for three years based on the sane three grounds.  Northrop's fifth

7   parole consideration hearing took place on September 27, 1999.  The Board denied Northrop parole

8   for four years based on the same three grounds.  Northrop attended his sixth parole consideration

9   hearing on July 24, 2004.  The Board denied parole based on the commitment offense, unstable

10  social history, and an unfavorable 2004 psychological evaluation.  The Board denied parole for one

11  year.  The habeas petition before the court focuses solely on whether the Board's 2004 decision was

12  in accord with federal law.  Northrop's seventh parole hearing was on November 28, 2005.  Again,

13  the Board denied parole.

14              B.    Exhaustion of State Remedies Regarding 2004 Parole Denial

15          Northrop filed a petition for a writ of habeas corpus in the Superior Court of San Mateo

16  County on April 5, 2005.  This petition challenged the Board's 2004 denial of parole. The petition

17  presented generally the same arguments before the court in the instant action, except Northrop also

18  challenged the constitutionality of his murder conviction on grounds not pertinent to the instant

19  action.  The Superior Court denied the petition on May 27, 2005.  Resp.'s Exh. 13.  This was the last

20  reasoned court opinion.  Northrop filed a petition for a writ of habeas corpus in the California Court

21  of Appeal on August 5, 2005.  The court denied the petition on October 12, 2005.  Finally, Northrop

22  filed a petition in the Supreme Court of California on October 25, 2005.  The petition was denied on

23  January 4, 2006.

24              C.    Past Attempts to Challenge Conviction on Constitutional Grounds

25          Northrop has filed several petitions in state court challenging his conviction on constitutional

26  grounds not pertinent to the instant action.  On July 16, 1984 the Superior Court of San Mateo

27  denied his petition.  Northrop filed a new petition in the California Court of Appeal, which was

28

4

1    subsequently denied on August 27, 1984.  Finally, Northrop filed a petition for writ of habeas corpus

2    in the California Supreme Court, which was denied on November 21, 1984.

3          Northrop has filed several petitions in federal court challenging the judgment of his

4    conviction.  On April 14, 1986 Northrop filed in this court a petition for writ of habeas corpus

5    seeking relief from judgment on grounds not pertinent to the instant action.  The court denied that

6    petition.  Northrop appealed, and on April 25, 1998 the Ninth Circuit dismissed the appeal for failure

7    to perfect it.  On April 6, 1990, Northrop filed another petition for habeas corpus in this court

8    challenging the basis of his conviction on constitutional grounds not pertinent in the instant action.

9    On October 3, 1991 the court issued an order of dismissal without prejudice to allow Northrop to

10   exhaust state remedies.  On February 16, 1995, Northrop filed a third petition for writ of habeas

11   corpus, which was assigned to Judge Jensen.  On May 5, 1995, the court dismissed the petition for

12   failure to exhaust state remedies.  Finally, on June 26, 1997, Northrop filed a fourth petition for writ

13   of habeas corpus, challenging the judgment of conviction on grounds not pertinent to the instant

14   action.  On March 5, 1998 the court ordered the petition be transferred to the Ninth Circuit pursuant

15   to 28 U.S.C. section 1631.  The Ninth Circuit denied that petition on April 30, 1998.

16

17   Jurisdiction And Venue

18         This court has subject matter jurisdiction over this habeas action under 28 U.S.C. section

19   2254. 28 U.S.C. § 1331.  This action is in the proper venue because the challenged action occurred

20   at San Quentin State Prison in Marin County, California, within this judicial district.  28 U.S.C. §§

21   84, 2241(d).

22

23   Exhaustion

24         Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings

25   either the fact or length of their confinement are required to first exhaust state judicial remedies,

26   either on direct appeal or through collateral proceedings, by presenting the highest state court

27   available with a fair opportunity to rule on the merits of each and every claim they seek to raise in

28

1   federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies

2   were exhausted for the claims asserted in the petition.

3

4   LEGAL STANDARD

5   I.      Liberty Interest in Parole

6           The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of

7   life, liberty, or property without due process of law.  U.S. Const. amends. V, XIV.  In the parole

8   context, a violation of an inmate's due process occurs when (1) the inmate has been deprived of a

9   constitutionally protected liberty interest in parole and (2) the inmate has been denied adequate

10  procedural protections in the parole process.  See, e.g., Biggs v. Terhune, 334 F.3d 910, 913 (9th

11  Cir. 2003).

12          There is no cognizable right to parole under the Federal Constitution.  The Supreme Court

13  has held, however, that when a state's parole statute uses mandatory language, the statute "creates a

14  presumption that parole release will be granted" unless certain findings are made, and thereby gives

15  rise to a constitutionally protected liberty interest.  Greenholtz v. Inmates of Nebraska Penal &

16  Correctional Complex, 442 U.S. 1, 12 (1979); Board of Pardons v. Allen, 482 U.S. 369, 377–78

17  (1987).  California Penal Code section 3041 states that "[t]he panel or board *shall* set a release date

18  *unless* it determines that" statutorily defined determinations are met. (emphasis added).  Thus, under

19  Greenholtz and Allen, the Ninth Circuit found "that California's parole scheme gives rise to a

20  cognizable liberty interest in release on parole."  McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir.

21  2002); see also Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006) (holding

22  California inmates have a constitutionally protected liberty interest in parole).  The second prong of

23  the due process inquiry—whether the inmate has been afforded an adequate parole process—is

24  satisfied if two considerations are met.  First, the parole procedure itself must provide an inmate with

25  sufficient safeguards.  The inmate must be afforded an opportunity to be heard before an unbiased

26  decision-maker, and in the case of a denial of parole, must be informed of the reasons underlying the

27  decision.  Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987).  Second, some

28

UNITED STATES DISTRICT COURT
For the Northern District of California

6

1  evidence must support the decision to grant or deny parole.  Id. (adopting the some evidence

2  standard established by the Supreme Court in Superintendent v. Hill, 472 U.S. 445, 457 (1985));

3  Irons v. Carey, 479 F.3d 658, 662 (9th. Cir. 2007).  The evidence underlying the grant or denial of

4  parole must have "some indicia of reliability."  McQuillion, 306 F.3d at 904 (quoting Jancsek, 833

5  F.2d at 1390).

6          However, the deferential some evidence standard has outer limits.  If it is established that a

7  particular judgment was predetermined, then a prisoner's due process rights will have been violated

8  even if there is some evidence to support the decision.  See Bakalis v. Golembeski, 35 F.3d 318, 326

9  (7th Cir. 1994) (holding that a decision-making body "that has prejudged the outcome cannot render

10  a decision that comports with due process."); In re Rosenkrantz, 29 Cal. 4th. 616, 677 (2002)

11  (holding that a parole decision "must reflect an individualized consideration of the specified criteria

12  and cannot be arbitrary and capricious.").  The California Supreme Court has explicitly stated that a

13  blanket no-parole policy as to a certain category of prisoners is unconstitutional.  In re Minnis, 7

14  Cal. 3d 639, 645–46 (1972); In re Morrall, 102 Cal. App. 4th 280, 291 (2003).

15  II.    Habeas Corpus

16          The court is required to analyze state habeas claims under the Antiterrorism and Effective

17  Death Penalty Act of 1996 ("AEDPA").  AEDPA provides that an:

18          application for a writ of habeas corpus on behalf of a person in custody pursuant to the
            judgment of a State court shall not be granted with respect to any claim that was
19          adjudicated on the merits in State court proceedings unless the adjudication of the claim
            resulted in a decision that was contrary to, or involved an unreasonable application of,
20          clearly established Federal law, as determined by the Supreme Court of the United
            States.

21  28 U.S.C. § 2254(d)(1).

22          Accordingly, this court will review the last reasoned state court opinion under the standards

23  outlined in AEDPA.  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  The Supreme Court has

24  interpreted AEDPA to require a district court to uphold the state court's decision unless that decision

25  was an objectively unreasonable application of a clearly established federal law.  Lockyer v.

26  Andrade, 538 U.S. 63, 75 (2003).  The last reasoned state court opinion occurred in the Superior

27  Court for the County of San Mateo.  Thus, this court will apply the deferential AEDPA standard to

28

7

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1 | the Superior Court proceeding to determine whether it was objectively unreasonable to find the

2 | denial of Northrop's parole to be supported by some evidence.

3 |

4 | DISCUSSION

5 |      Northrop argues the Board's decision to deny him parole in 2004 violated his right to due

6 | process.  First, Northrop argues that the Board lacked some evidence to deny him parole.  Second,

7 | Northrop claims the Board failed to consider the substantial evidence showing his suitability for

8 | parole.  Northrop further claims that the Board's decision to deny him parole was unfounded and

9 | arbitrary and in violation of the Board's own statutory and regulatory provisions.  Northrop is thus

10 | challenging an internal policy of denying parole to prisoners convicted of murder in contravention of

11 | legislative intent.

12 |      Respondent argues that this court must uphold the Superior Court's decision to deny his

13 | petition.  Respondent claims California inmates do not have a liberty interest in parole and that due

14 | process in a parole setting only requires notice of hearing and an opportunity to be heard.  Since

15 | Northrop was entitled to notice and an opportunity to be heard, his due process was not violated.

16 | Alternatively, if due process requires some evidence to support the parole decision,  argues some

17 | evidence supported the 2004 Board decision denying Northrop parole.

18 | I.     Due Process Violation

19 |      The parties dispute whether Northrop, as a California inmate, has a liberty interest in parole.

20 | The parties also dispute whether some evidence is required to support the Board's decision to deny

21 | Northrop parole.  The court will consider these arguments in turn.

22 |      A.     Liberty Interest in Parole

23 |      Respondent argues that there is no federal liberty interest in parole.  As discussed above, the

24 | Ninth Circuit has consistently held that the mandatory language of California Penal Code section

25 | 3041 creates a constitutional liberty interest in parole.  See, e.g., McQuillion, 306 F.3d at 901; Sass,

26 | 461 F.3d at 1128.  Respondent further argues that an inmate's constitutional liberty interest is

27 | limited to freedom from restraint which "[i]mposes atypical and significant hardship on the inmate

28 |

UNITED STATES DISTRICT COURT
For the Northern District of California

1    in relation to the ordinary incidents of prison life." <u>Sandin v. Conner</u>, 515 U.S. 472 (1995).

2    Respondent argues that because incarceration cannot be an atypical and significant hardship for an

3    inmate serving a potential life term, Northrop has no federal liberty interest in parole.  Despite

4    Respondent's argument, the Ninth Circuit has consistently held that the <u>Sandin</u> standard only applies

5    to internal prison disciplinarian regulations, not parole hearings.  <u>See, e.g.</u> <u>Biggs</u>, 334 F.3d at 914.

6         Respondent next argues that even if a prisoner has a federal liberty interest in parole, due

7    process only requires notice and an opportunity to be heard.  As discussed above, the Ninth Circuit

8    has consistently held that more is required in the parole setting.  Specifically, some evidence must

9    support the Board's decision to deny parole.  <u>See, e.g.</u> <u>Sass</u>, 461 F.3d at 1129; <u>Irons</u>, 479 F.3d at

10    662.

11         The court assumes that respondent raises this issue respectfully, despite clear Ninth Circuit

12    law, in an attempt to preserve it for ultimate review by the Supreme Court.  If this is the case,

13    respondent shall henceforth merely assert the issue and not consume the time and effort of the

14    parties and the court in rehashing it.  A mere assertion of it without belaboring the argument will be

15    deemed sufficient to preserve it for appeal.  If that is not the purpose then respondent should spare

16    the court and parties the unnecessary time and effort on an issue where the law is well-settled in this

17    Circuit.

18         The court concludes once again that California prisoners continue to have a constitutional

19    liberty interest in parole.

20         B.     <u>Application of Some Evidence Standard</u>

21         Northrop contends that there was no evidentiary basis for the Board's denial of parole in

22    2004.  Respondent argues that the Board identified specific evidence in support of denying parole,

23    such as the callousness of the commitment offense, Northrop's trivial reason for failing to act, the

24    degree of defilement sustained by the twenty-two month old victim, and an unfavorable 2004

25    psychological report questioning, among other things, Northrop's remorse and sincerity.  Resp.'s

26    Answer ¶¶ 17, 19.  The Superior Court of San Mateo upheld the Board's decision based on the

27    commitment offense and the unfavorable 2004 psychological report.  Resp.'s Exh. 13 at 3–5.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1

2          1.      The 2004 Psychological Report Constitutes Some Evidence to Deny Parole

3          The Board relied primarily on the most recent psychological report from 2004 in denying

4   Northrop parole.  PT at 123–24; Pet. Br. at 38.  The Board is allowed to consider "[a]ll relevant,

5   reliable information available to the panel" which includes information on a  prisoner's "past and

6   present mental state."  See 15 Cal. Code Regs § 2402(b).  Psychological reports are relevant evidence

7   the Board is allowed to rely on in determining a prisoner's suitability for parole.  Rosa v. Nielsen,

8   428 F.3d 1229, 1232–33 (9th Cir. 2005) (per curiam); Elkins v. Brown, No. 05-1722, 2006 WL

9   3782892, at *7 (N.D. Cal. Dec 21, 2006) (Patel, J.).

10         The Board interpreted staff psychologist Dr. Poston's psychological report to support a

11  denial of parole.  The report found Northrop had a "grandiose sense of self-importance, a sense of

12  entitlement and a lack of empathy" and that his "level of remorse and empathy are less than would

13  be expected given the nature of his offense."  Resp.'s Exh. 7, Poston Report, ¶¶ XII(A), XIII(C)

14  (hereinafter "PR").  At their meeting, Northrop presented Dr. Poston with a typed statement

15  claiming "[i]f I had ever actually seen my ex-wife, Sheila, abuse her daughter I would have

16  intervened."  Id. ¶ XIII(A).  Considering the degree of physical harm Kelley sustained over a period

17  of several months, Dr. Poston found Northrop's comments about the commitment offense self-

18  serving, inconsistent and evasive.  Id. ¶  XIII(A), (C); see also Resp.'s Exh. 2 at 4 (showing that

19  Northrop had previously admitted he knew there was a continual problem with his wife beating

20  Shelley).  Dr. Poston believes Northrop's narcissism influenced his earlier behavior. Id. ¶ XIII(D).

21  Dr. Poston concluded Northrop's risk of engaging in violent behavior post-release was low to

22  moderate.  Id. ¶ XIV(A)-(B).  Because Northrop's parole plans involved living with his new family

23  and considering the nature of Northrop's commitment offense and his personality disorder, Dr.

24  Poston strongly recommended that if Northrop is released he should seek professional help with

25  parenting skills on a continual basis.  Id. ¶ XV.

26         The Board also relied upon a 1989 psychological report Dr. Poston made reference to in his

27  evaluation.  PT at 118–19.  The 1989 report, written by staff psychologist Dr.Viesti, found that

28

10

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Northrop needed to address his narcissism and egocentricity, his hostility toward Kelley (Northrop

2  had previously called her "a fucking rat"),[3] his dishonesty and inconsistency in describing the

3  commitment offense, his inconsistent view of himself as both a victim of uncontrollable

4  circumstances and as a party responsible for Kelley's death, and his attraction to underage females.[4]

5  PT at 120–22; Resp.'s Exh. 9 at 2–4.  The 1989 psychological report concluded that "many issues of

6  major proportion remain."  Resp.'s Exh. 9 at 4.  The board noted both the 1989 and 2004 negative

7  psychological reports were contradicted by several favorable psychiatric reports. PT at 121–22.  The

8  board requested a new psychiatric report so all of these factors and conflicting psychological

9  determinations could be addressed.  Id. at 122.

10      Northrop argues Dr. Poston's 2004 report can only be interpreted as supportive of parole.

11  Northrop points to Dr. Poston's observation that Northrop's participation in educational programs

12  and his current support from his family increases his chance of making a successful post-

13  incarceration transition.  PR ¶ XIV(C).  Northrop further points to conflicting psychological reports

14  in support of his parole.  For example, Kenneth Barclay, a therapist for the United States Department

15  of Veteran Affairs, sent a letter to the Board in 2004 stating "[i]t is my professional opinion that Mr.

16  Northrop no longer represents a danger to society and has shown the desire, motivation and ability to

17  continue living in a manner consistent with societal norms."  Pet.'s Exh. H , Barclay Letter, at 2.

18  Other psychological evaluations are consistent with Barclay's report.  See, e.g, Pet.'s Exh. E,

19  September 1999 Lifer Hearing, at 4 ("Northop . . . has appropriate remorse for his past actions . . . he

20  appears to be suitable for parole based on psychological grounds.").

21      On the other hand, Northrop also has presented strong evidence that Dr. Poston's and Dr.

22  Viesti's psychiatric evaluations are inconsistent with other psychiatric evaluations concluding that

23  Northrop is not a danger to society and feels the proper remorse for the death of Kelley.  Indeed, Dr.

24  Poston's evaluation can reasonably be construed as not supportive of parole.  Even Northrop himself

25  admits his self-absorption played a large role in his commitment offense.  Furthermore, Dr. Poston's

26  determination that Northrop is inconsistent, evasive, narcissistic, self-absorbed, and unremorseful

27  speaks directly to his lack of suitability for parole.  Dr. Poston fears that Northrop's commitment

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   offense and personality disorder will affect his ability to care for his wife and child and indicate

2   Northrop's dangerousness and unsuitability for parole.  In addition, a determination that an inmate

3   presents a low to moderate risk of violence to the community if released constitutes some evidence

4   supporting a denial of parole.  Elkins, No. 05-1722, 2006 WL 3782892, at *7.  While several

5   psychological evaluations have determined Northrop's suitability for parole, it is not the job of the

6   court to re-weigh the evidence but rather to ensure that some evidence exists to prevent the Board

7   from acting arbitrarily.  See, e.g., Sass, 461 F.3d at 1128.  The Board acted reasonably in requesting

8   additional psychological evaluations to reconcile the conflicting determinations of Northrop's

9   suitability for parole.

10      Thus, based on the negative aspects of Northrop's psychological evaluations, some evidence

11  existed to deny Northrop parole.

12      2.      The Commitment Offense Constitutes Some Evidence to Deny Parole

13      Section 2402 of Title 15 of the California Code of Regulations ("section 2402") sets forth a

14  non-exhaustive list of factors to consider when determining an inmate's suitability or unsuitability

15  for parole.  Subsection (c) of section 2402 enumerates six factors that tend to show unsuitability for

16  parole, one of which is whether the prisoner's incarcerating offense was committed in "an especially

17  heinous, atrocious, or cruel manner."  15 Cal. Code Regs § 2402(c)(1).  Three indices used to

18  determine whether a commitment offense was heinous are whether "[t]he victim was abused, defiled

19  or mutilated during or after the offense", whether the offense was "carried out in a manner which

20  demonstrates an exceptionally callous disregard for human suffering", and whether "[t]he motive for

21  the crime is inexplicable or very trivial in relation to the offense".  15 Cal. Code Regs §

22  2402(c)(1)(C)-(E).  The Board believed that these three factors demonstrated Northrop's

23  dangerousness and thus supported its decision to deny Northrop parole.  See Irons, 479 F.3d at

24  662–63 (holding some evidence must show that the prisoner is too dangerous to the public to be

25  deemed suitable for parole); In ree Lee,143 Cal. App. 4th 1400, 1408 (2006) (same).  The Board

26  considered the circumstances of the murder and concluded the victim was mutilated during the

27

28

12

UNITED STATES DISTRICT COURT
For the Northern District of California

1   offense and that Northrop's reason for failing to intervene was trivial and exhibited an exceptionally

2   callous disregard for the suffering of his defenseless twenty-two-month old daughter.  PT at 116–18.

3       Biggs, Sass, and Irons focus on the probative value the Board should afford the commitment

4   offense in the context of determining a prisoner's suitability for parole.  While the court in Biggs

5   upheld a denial of parole based on the gravity of the commitment offense, the court stated that

6   continued reliance on unchanging factors "runs contrary to the rehabilitative goals espoused by the

7   prison system and could result in a due process violation."  Biggs, 334 F.3d at 917.  The court in

8   Sass seemingly rejected the rule that reliance on an unchanging factor would eventually violate due

9   process because "it is not our [the court's] function to speculate about how future parole hearings

10  could proceed."  Sass, 461 F.3d at 1129.  Irons subsequently clarified the tension between Biggs and

11  Sass:

12          All we held in those cases and all we hold today, therefore, is that, given
            the particular circumstances of the offenses in these cases, due process
13          was not violated when these prisoners were deemed unsuitable for parole
            prior to the expiration of their minimum terms.
14

    Irons, 479 F.3d at 665.

15

16      Irons reaffirmed the holding in Biggs, and expressed hope that the Board will "come to

17  recognize that in some cases, indefinite detention based solely on an inmate's commitment offense,

18  regardless of the extent of his rehabilitation, will at some point violate due process. . . ." Id. (quoting

    Biggs, 334 F.3d at 917).  The lesson from Biggs, Sass, and Irons is that the court can look at
19

20  immutable events to predict parole suitability after the initial denial, but as time passes and the

21  prisoner demonstrates favorable behavior, the weight accorded to these unchanging events should

22  decrease because they no longer act as sufficient predictors of the prisoner's dangerousness.  Willis

    v. Kane, 485 F. Supp. 2d 1126, 1130 (N.D. Cal. 2007) (Patel, J.).
23

24      In considering Ninth Circuit precedent on the probative weight given to the commitment

25  offense, the court holds in the instant action that the commitment offense provides some evidence

26  for denying Northrop's parole.  First, Biggs and Irons warned against immutable events, such as the

    commitment offense, being the sole basis of a parole denial.  See Irons, 479 F.3d at 665; Biggs, 334
27

28

                                        13

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   F.3d at 917.  However, the commitment offense was not the sole rationale for the denial of parole, so

2   the Board does not need to prove Northrop's offense suggested viciousness beyond the minimum

3   elements of his murder conviction.  In re Rosenkrantz, 29 Cal. 4th. at 682–83; accord In re

4   Dannenberg, 34 Cal. 4th 1061, 1094–95 (2005).  Courts have held that relying on the commitment

5   offense after the expiration of a prisoner's minimum term may violate due process because the

6   commitment offense is no longer probative of a prisoner's current dangerousness.  See Martin v.

7   Marshall, 431 F. Supp. 2d. 1038, 1046–47 (N.D. Cal. 2006) (Patel, J.) (holding that reliance on

8   petitioner's commitment offense was not a suitable reason for a reversal of parole because petitioner

9   had been incarcerated beyond his minimum sentence term); Willis, 485 F. Supp. 2d at 1135–36

10  (holding that Board's reliance on the commitment offense as the paramount factor in denying a

11  prisoner parole past his minimum sentence term violated due process).  While Northrop has eclipsed

12  the minimum terms of his incarceration and thus the probative value of his commitment offense

13  would not otherwise suffice as some evidence, Dr. Poston's 2004 psychological report rekindles the

14  same concerns regarding Northrop's narcissism, self-absorption, and callousness that originally led

15  the Board to label his crime as heinous.  Thus, the probative value of Northrop's commitment

16  offense is not nil or substantially reduced as in Martin, but is still pertinent to Northrop's suitability

17  for parole.  See 15 Cal. Code Regs § 2402(b) ("Circumstances which taken alone may not firmly

18  establish unsuitability for parole may contribute to a pattern which results in a finding of

19  unsuitability.").

20          Northrop argues that his commitment offense does not exhibit a callous disregard for human

21  life but rather a "profound sense of denial and self-absorption." Pet. Br. at 37; see also Pet.'s

22  Traverse at 6 (arguing Northrop's commitment offense was not the result of callousness but poor

23  interpersonal skills and paying too much attention to his career).  The court fails to see the

24  distinction.  Northrop was aware that his wife had routinely beaten Kelley prior to the date of the

25  commitment offense.  He was too self-absorbed to stop it or to usurp his wife's role as the dominant

26  parent.  On the night of Kelley's murder, Northrop knew Kelley was being beaten, knew she had

27  vomited soon after being beaten, failed to intervene and voluntarily retired to the bedroom and

28

turned on the air conditioner to block out the sound of the beatings. See In re Fuentes, 135 Cal. App. 4th 152, 162 (holding that while petitioner did not commit the fatal stabbing, he exhibited extreme callousness by failing to intervene or assist the victim); compare Machado v. Kane, No. 05-01632, 2006 WL 449146, at *5 (N.D. Cal. Feb. 22, 2006) (Alsup, J.) (holding that whether petitioner condoned or anticipated his partner's murderous violence during a robbery was irrelevant because he is responsible for all the reasonably foreseeable acts of violence) with Resp.'s Exh. 8 (letter from retired trial judge who oversaw Northrop's conviction claiming Northrop acquiesced to his wife's brutality and was thus equally responsible, if not more so, for Kelley's death). The court's focus in this regard is Northrop's callousness in the face of human suffering. See 15 Cal. Code Regs. § 2402(c)(1)(D); In re Weider, 145 Cal. App. 4th 570, 587 (2006). The extent of the suffering Kelley sustained is undisputed and severe; that Northrop did nothing to abate Kelley's suffering but instead chose to ignore it betrays the depth of his callousness. The extremely young age of his daughter, coupled with Dr. Poston's 2004 unfavorable psychological evaluation, further underscores Northrop's callousness. Northrop's explanation for this failure to act—that he was young, immature and unable to cope with the stressors of marriage—does not refute the Board's determination that his excuse was trivial and exhibited an extremely callous disregard toward his daughter's suffering. See In re Fuentes, 135 Cal. App. at 163 (holding that being young, immature, and making poor decisions does not refute the finding that a crime was committed with only a trivial motive). Considering the nature of the commitment offense and Dr. Poston's psychological report, it was not unreasonable for the Board to conclude that Northrop would pose an unreasonable risk of danger to society if granted parole.

While Northrop's trivial motivation for failing to intervene and the extreme callousness his decision exhibits constitutes some evidence to support a denial of parole, the Board's reliance on the defilement of Kelley's body does not satisfy the some evidence standard. Sheila, not Northrop, inflicted the substantial physical abuse upon Kelley. Section 2402 requires the Board to explicitly consider the individual actions of the prisoner. See 15 Cal. Code Regs. § 2402(c)(1) (the determination is whether "[t]he prisoner committed the offense in an especially heinous, atrocious or

15

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  cruel manner."). This requires individualized consideration of the prisoner's actions and his

2  suitability for parole. <u>Rio v. Board of Prison Term Comm'rs</u>, No. 05-1483, 2006 WL 3783575, at *6

3  (N.D. Cal. Dec. 21, 2006) (Patel, J.); <u>In re Rosenkrantz</u>, 29 Cal. 4th at 682. Attributing the abuse

4  Sheila inflicted upon Kelley to Northrop contradicts the requirement that the Board individually

5  consider the actions of the petitioner in determining parole suitability. The abuse Northrop allowed

6  Sheila to inflict upon Kelley speaks to Northrop's callousness, but because Northrop did not defile

7  or mutilate Kelley, the mutilation Kelley sustained may not necessarily speak to Northrop's

8  dangerousness. Thus, the abuse Sheila inflicted upon Kelley is not some evidence of Northrop's

9  unsuitability for parole.

10      In conclusion, because Northrop's commitment offense exhibited extreme callousness to the

11  suffering of his extremely young daughter and his motive for failing to intervene was trivial, some

12  evidence exists to support the Board's 2004 decision to deny Northrop parole.

13                      3.      Other Evidence Showing Unsuitability for Parole

14      Other evidence in the record exists that may constitute some evidence of unsuitability. Even

15  if the Board does not articulate evidence pertinent to a determination of parole suitability, the court

16  should still consider all evidence in the record to determine whether it supports or weakens the

17  petitioner's case for parole. <u>See Hernandez v. Small</u>, 282 F.3d 1132, 1140 (9th Cir. 2002) (holding

18  in habeas proceedings that the "intricacies of the state court's analysis need not concern us; what

19  matters is whether the *decision* the court reached was contrary to controlling federal law.")

20  (emphasis in original). The Board mentioned that on June 24, 1978 Northrop was arrested for

21  possession of marijuana and the possession of a concealed weapon. He was eventually convicted

22  and paid a $354.00 fine. PT at 28; Pet.'s Exh. 2 at 3. A fine for possessing marijuana and a

23  concealed weapon over two decades ago is not probative of Northrop's current unsuitability for

24  parole and is the type of unchanging event <u>Biggs</u>, <u>Irons</u>, and <u>Martin</u> discourages courts from relying

25  upon. Thus it does not constitute some evidence for finding Northrop unsuitable for parole.

26      A factor showing unsuitability is whether the prisoner "has a history of unstable or

27  tumultuous relationships with others." 15 Cal. Code Regs § 2402(c)(3). The Board briefly

28

mentioned two facts that may speak to Northrop's unstable relations with others: Northrop's less than honorable discharge from the Army and Northrop's relationship problems with his stepmother. First, in 1979 Northrop received a less than honorable discharge from the Army which was later changed to honorable.[5]  Resp.'s Exh. 3 at 118.   The Army Reviewing Board found his less than honorable discharge to be proper but not equitable and unanimously changed it to honorable. Resp.'s Exh. 2 at 3.  The parties dispute whether this constitutes reliable evidence of unsuitability or merely unsubstantiated insinuations of bad conduct.  The court is at a loss to fathom the probative value presented by this information.  Aside from being the type of unchanging event Biggs and Irons cautioned courts against using, it is unclear how a less than honorable discharge being vacated in favor of an honorable discharge provides reliable evidence to support a denial of parole.  Second, the Board cursorily mentioned that when Northrop was a child he had some relationship problems with his stepmother, but this was probably just "an ordinary fact of life" considering his biological mother and his father had been divorced.  PT at 118.  As this took place so long ago, this has no probative value or pertinence to his incarcerating offense and is the type of unchanging event Biggs and Irons cautioned courts against using to support a denial of parole.  Furthermore, one isolated problem with his stepmother does not represent a history of unstable relationships with others.  See 15 Cal. Code Regs §  2402(c)(3).  Thus this information cannot constitute some evidence to deny parole.

For the foregoing reasons, the other evidence in the record does not constitute some evidence to deny Northrop parole.

C.   Evidence Showing Suitability for Parole

Northrop claims the Board's 2004 decision arbitrarily and capriciously ignored the overwhelming evidence supporting a grant of parole.  Specifically, Northrop contends the Board ignored evidence of his stable social history, evidence of his remorse and his advanced age.  Beyond these considerations, Northrop also emphasizes his sterling work record as a prisoner photographer, his realistic post-parole plans, the therapy and self-help programs he has participated in and his new family.  Pet. Br. at 22–30, 41–43.  Factors tending to show suitability for parole include: the lack of a juvenile record; a stable social history; signs of remorse; whether the crime was committed as a

result of significant stress, especially ongoing stress built over a long period of time; no history of violent crime; the petitioner's advanced age reducing the likelihood of recidivism; the petitioner having realistic post-parole plans or marketable skills that can be put to use upon release; and if institutional activities signal an ability to function in society.  See 15 Cal. Code Regs § 2402(d)(1)-(4), (6)-(9).  These factors are general guidelines, and the importance attached to any one factor or combination of factors is up to the discretion of the Board.  15 Cal. Code Regs § 2402(d).

The Board took into account Northrop's stable social history.  The Board noted Northrop's marketable job skills, the educational and vocational programs in which he has participated, and his lack of any disciplinary violations or juvenile criminal history.  PT at 118.  The Board further considered Northrop's positive work record, his support from the community and his participation in various organizations, such as Toys for Christmas and his leadership position in the Buddhist Spiritual Program.  Id. at 21 –25, 123.  The Board encouraged Northrop to continue his good work and not to lose hope.  PT at 122–23.  Thus, the Board properly considered Northrop's stable social history.

The Board properly considered evidence of Northrop' remorse.  Northrop presented—and the Board considered—evidence of his remorse, such as his favorable psychological evaluations.  Id. at 24–31, 99, 106–08.  The Board noted Dr. Poston's evaluation of Northrop's remorse conflicted with the positive psychological evaluations presented by Northrop.  Id. at 122–24.  Thus, the court did take into account evidence showing Northrop's remorse.

This court has been unable to locate any evidence to establish that the Board explicitly considered Northrop's advanced age in determining his suitability for parole.[6]  However, the court is not convinced that this failure results in a due process violation.  See 15 Cal. Code Regs § 2402(d) (factors are general guidelines, and the Board has discretion to afford the factors whatever importance it sees fit); Greenholtz, 442 U.S. at 10, 15 (holding that there are no set of facts a petitioner can present that mandates a favorable decision from the parole board and that nothing requires the Board to specify the particular evidence it relies on it making its discretionary determination); In re Elkins, 144 Cal. App. 4th 475, 492 n.4 (2006) (noting petitioner's age was

UNITED STATES DISTRICT COURT
For the Northern District of California

implicitly known and considered by the Governor because the Governor knew how old the petitioner was at the time of his commitment offense).  Northrop argues that his advanced age speaks to his maturity, which provides a stark contrast to his youth and immaturity at the time of the offense. While not explicitly mentioning his age, the Board's numerous references to Northrop's commendable work ethic, his leadership positions in various organizations, and the educational and therapeutic programs he has participated in all speak to Northrop's maturity.  After considering this favorable information, the Board, in its discretion, denied parole based on other factors.

Thus the Board did not unjustly fail to consider evidence showing suitability in denying Northrop parole.

II.       The No Parole Policy

Northrop argues the Board has a habit of arbitrarily denying parole to murderers who would otherwise qualify for parole as directed by section 3041.  Pet.'s Traverse at 23 (citing In re Ramirez, 94 Cal. App. 4th 549, 564 (2001)).  Northrop contends that the Board's decision failed to take into account the individual circumstances of his case.[7]

Due process in the parole setting entitles Northrop to a board hearing that is free from prejudice or bias.  O'Bremski v. Maas, 915 F.2d 418, 422 (9th Cir. 1990).  The decision must "reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious."  In re Rosenkrantz, 29 Cal. 4th at 677.  The Superior Court of San Mateo found that the Board's 2004 denial of parole was not arbitrary because it "based it's [sic] decision on factors that related specifically to [Northrop]."  Resp.'s Exh. 13 at 5.

This court agrees with the Superior Court.  The Board's decision was tailored to the individual circumstances of Northrop's case.  Northrop's repeated claim that the Board's sole reliance on his commitment offense is indicative of bias against murderers and lacks individualized consideration of his rehabilitation is refuted by the fact that the 2004 psychological report, not the commitment offense, was the main factor for the parole denial at issue.  PT at 124–25.  The evidence cited previously shows that the Board adequately considered the evidence bearing on the unique

UNITED STATES DISTRICT COURT
For the Northern District of California

19

1   circumstances of Northrop's suitability for parole.  In contrast to Northrop's contention that the 2004

2   parole hearing failed to tailor its decision to Northrop's individual circumstances, the Board

3   admonished Northrop to continue his good work, told Northrop he was close to a finding of

4   suitability, and offered Northrop advice on how to make a good impression for the next

5   psychological evaluation.  Id. at 122–24.  Northrop has been unable to point to any specific evidence

6   that the Board failed to afford him the individualized, unbiased consideration due process requires in

7   the parole setting.

8            For the foregoing reasons, Northrop's argument that the parole board contravened legislative

9   intent is unpersuasive.

10

11  III..    Request for Hearings

12           Pursuant to Habeas Local Rule 2254-8(a), Northrop requests oral argument to address

13  whether some evidence exists to deny parole and whether the Board's practices disregards

14  California's legislative scheme for life prisoners.  Northrop also requests an evidentiary hearing on

15  disputed issues of fact pursuant to Habeas L.R. 2254-7(a).  The court declines to grant both oral

16  argument and an evidentiary hearing.  Oral argument is unnecessary; the factual record suffices.

17  Northrop argues that an evidentiary hearing is needed because respondent contests the factual issue

18  of whether the Board rarely grants parole to lifers and whether older prisoners have a lower

19  recidivism rate.  Northrop mischaracterizes respondent's argument.  Respondent does not dispute

20  that older prisoners generally have a lower recidivism rate or that the Board rarely grants parole to

21  lifers.  Instead, respondent was arguing that habeas relief is not warranted on these two issues.  Thus,

22  the court also denies Northrop's request for an evidentiary hearing.

23

24

25

26

27

28

1

2

3   CONCLUSION

4          For the foregoing reasons, the petition is denied on the merits.  The clerk shall close the file.

5          IT IS SO ORDERED.

6

7

8   DATED:   August 2, 2007                                    _____

9                                                              MARILYN HALL PATEL
                                                               Judge
10                                                             United States District Court
                                                               Northern District of California

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3                                    ENDNOTES

4   1.  All facts are taken from the Petition unless otherwise noted.

5   2.  Respondent presents a letter submitted by the officers who investigated Kelley's death. Resp.'s
6   Exh. 19.  The letter claims Northrop explicitly admitted to hearing Kelley being rammed against the
    rim of the toilet bowl, that Northrop stated he was relieved when Kelley's cries turned to whimpers,
7   and that he made the best love of his life when Sheila returned from beating Kelley.  Northrop
    claims he never made these statements and that the police are fabricating these inflammatory
8   admissions. Northrop provides transcripts of his lengthy interviews and statements with the police
    and points out that none of the statements Northrop allegedly made to the investigating officers can
9   be found in the police transcripts.  After a review of the police record, the court cannot find any
    record of these alleged statements.  Many of Northrop's statements seem to directly contradict the
10  officer's assertions.  For example, Northrop repeatedly stated he could not hear precisely what was
    happening in the bathroom due to the air conditioner and his unwillingness to accept what was going
11  on.  Further, the police transcript has Northrop describing the love-making that occurred when
    Sheila returned to bed as "nothing . . . out of the ordinary."  Pet's Exh. C-4 at 19.  These
12  inflammatory statements will not be considered by this court.
13

14  3.  Respondent states that Northrop called Kelley a "fucking brat." The record states Northrop called
15  her a "fucking rat." Resp.'s Exh. 9 at 2.

16  4.  When Northrop first met Sheila, he was married to his first wife, a sixteen-year-old named Kay.
    Resp.'s Exh. 9 at 1.  Northrop was nineteen when he married Kay.  Id.  A year after his marriage to
17  Kay, Northrop met and fell in love with Sheila, who was fifteen.  Id.  Northrop established a
    menage-a-trois relationship between himself, Kay and Sheila.  Id.  Northrop later married Sheila on
18  July 14, 1979.
19

20  5.  The Board incorrectly stated that Northrop was discharged in 1974.  The record indicates he
    entered the Army in 1974, but was discharged January 5, 1979.  Resp.'s Exh. 2 at 3.
21

22  6.  Northrop was twenty-two at the time of the commitment offense, approximately three weeks
    away from this twenty-third birthday.  He was forty-seven at his 2004 parole hearing.
23

24  7.  Northrop makes repeated mention of former Governor Davis' policies and his 99% parole denial,
    but the instant action concerns Northrop's 2004 denial of parole.  Arnold Schwarzenegger was
25  governor in 2004. In Northrop's petition, he concedes Schwarzenegger's parole reversal rate for
    murderers is around 75%.  But in his traverse, Northrop focuses on Davis's 99% reversal rate and
26  argues that such a high reversal rate shows that individual consideration in the parole suitability
    context is an "empty ritual."  Pet.'s Traverse at 24.  Former Governor Davis's policies will not be
27  imputed to Governor Schwarzenegger.   See Rio. No. 05-1483, 2006 WL 3783575, at *9 ("[T]he

28
                                            22

bias [the petitioner] claims existed was based on former Governor Gray Davis' alleged no-parole policy, but the former governor's policies and statements cannot be attributed to his successor.").

UNITED STATES DISTRICT COURT
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28